UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | Case No: | 24-16918 - KHT |
| MICHELLE DEON LEE, | | |
| Debtor | | |
| | Chapter | 7 |
| BELLCO CREDIT UNION and its SUCCESSORS, | | |
| ASSIGNS, SERVICERS, TRUSTEES AND | | |
| INVESTORS, | | |
| Creditor | | |
| vs. | | |
| MICHELLE DEON LEE and TOM H. CONNOLLY, | | |
| Trustee | | |
| Respondents | | |

**<u>Amended Motion For Relief From Stay</u>**

       Comes now, BELLCO CREDIT UNION, hereinafter "Movant", by and through its attorneys, JANEWAY LAW FIRM, P.C., and requests that this Court enter an Order For Relief From Stay pursuant to 11 U.S.C. Section 362(d).  As grounds for this Motion, Movant states:

1.      Debtor filed this Bankruptcy petition on November 20, 2024.

2.      Movant seeks to terminate the automatic stay as to Movant.

3.      Debtor, MICHELLE D. LEE, signed a Note for the benefit of Movant or Movant's predecessors in interest on the Note.  Said Note was in the original amount of $300,000.00. Movant is in possession of or otherwise entitled to enforce said Note.

4.      Movant is a secured creditor by virtue of the Deed of Trust signed by Debtor MICHELLE D. LEE, recorded in the County where the property is located on April 19, 2022 at reception number 2022000034885.

5.      All rights and remedies under the Deed of Trust have been assigned to Movant pursuant to that certain Assignment of Deed of Trust.

6.      Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contacts, judgments, mortgages, loan modifications and security agreements in support of right to seek a lift of the automatic stay and foreclosure if necessary.  The copies were provided to counsel by Movant, or obtained from public records.

7.      The property (hereinafter "Property") described in the Deed of Trust and the subject of this Motion appears to be the Debtor's principal residence:

             LOT 21, REUNION FILING NO. 6, 2ND AMENDMENT, COUNTY OF ADAMS, STATE OF COLORADO.
             Purported Common Address: 16480 FAIRWAY DRIVE, COMMERCE CITY, CO 80022

8.      The current value of the property is approximately $1,061,000.00 pursuant to the debtor's schedules.

9.      As of May 23, 2025, the unpaid principal balance of the Note is $304,251.22.

10.     The current payment amount is $2,113.96 and includes principal and interest.

11.     Debtor is in default pursuant to the terms of the Note and Deed of Trust by failure to make payments as due.  As of May 23, 2025 Debtor is currently in default of 13 payments, along with other fees and charges.  A payment history is provided.  The approximate amount necessary to cure the default that gave rise to this motion is estimated to be:

| 1 Payment at $134.96 | $134.96 |
|---|---|
| 1 Payment at $130.60 | $130.60 |
| 1 Payment at $134.96 | $134.96 |
| 1 Payment at $130.61 | $130.61 |
| 1 Payment at $134.95 | $134.95 |
| 1 Payment at $2,113.32 | $2,113.32 |
| 1 Payment at $2,226.51 | $2,226.51 |
| 1 Payment at $2,113.32 | $2,113.32 |
| 1 Payment at $2,108.96 | $2,108.96 |
| 1 Payment at $2,113.64 | $2,113.64 |
| 1 Payment at $2,113.69 | $2,113.69 |
| 1 Payment at $2,100.59 | $2,100.59 |
| 1 Payment at $2,113.69 | $2,113.69 |
| Late Fees | $15.00 |
| Bankruptcy Attorney Fees & Costs | $1,424.00 |
| Estimated Total | $19,108.80 |

12.     An additional payment came due on May 28, 2025.

13.     The loan was not active in foreclosure prior to the bankruptcy petition being filed.

14.     To the best knowledge of the undersigned attorney, the Debtor has not recently requested a loan modification.

15.     The approximate payoff to Movant of the entire debt owed as of May 23, 2025 is estimated to be:

| Unpaid Principal Balance | $304,251.22 |
|---|---|
| Interest | $19,405.37 |
| Late Fees | $15.00 |
| (Suspense) | $-0.00 |
| Bankruptcy Attorney Fees & Costs | $1,424.00 |
| Estimated Total | $325,095.59 |

16.     Additional liens against the property include:
    a.    B&B Investments in the amount of $1,983.00 pursuant to Debtor's Schedules.
    b.    Kalamata Capital Group in the amount of $311,700.00 pursuant to Debtor's Schedules.**
    c.    Mulligan Funding LLC in the amount of $284,692.00 pursuant to Debtor's Schedules.***
    d.    Rushmore Servicing in the amount of $528,000.00 pursuant to Debtor's Schedules.
    e.    US Internal Revenue Service in the amount of $48,977.33 pursuant to Debtor's Schedules.

**Subject to Order Avoiding Lien at Docket #65
***Subject to Order Avoiding Lien at Docket #66

17.    Movant has cause for relief from stay pursuant to 362(d)(1).  Debtor has failed to make payments, and the increasing debt and the costs of obtaining and liquidating the property, leave Movant without adequate protection. Debtor's default constitutes cause for relief from stay pursuant to 362(d)(1).

18.    As further relief sought by Creditor in this Motion, Creditor requests that this Court's Order granting relief from stay be effective immediately, and not stayed pursuant to F.R.B.P. 4001(a)(3).

If the notice filed herein regarding this motion specifies a hearing date more than 30 days from filing the motion, Movant hereby waives its rights to have this matter heard sooner.

WHEREFORE, Movant requests this Court to enter an Order Granting Relief from Stay.

Dated: June 5, 2025
Attorneys for BELLCO CREDIT UNION
JANEWAY LAW FIRM, P.C.

_____
Lynn M. Janeway #15592
David R. Doughty #40042
Alison L. Berry #34531
N. April Winecki #34861
9540 Maroon Circle, Suite 320
Englewood, CO 80112
Phone: (303) 706-9990
Fax: (303) 706-9994
bankruptcy@janewaylaw.com
JLF #: 25-034634

In re:
MICHELLE DEON LEE,

Case Number:        24-16918 - KHT
Chapter:            7

### AFFIDAVIT REGARDING THE SERVICEMEMBER CIVIL RELIEF ACT

The undersigned checked the DMDC website maintained by the Department of Defense and found no record that the Debtor, or the persons obligated on the Note or Grantor(s) of the Deed of Trust as described in the Motion, are on active duty or entitled to the protections afforded under the Servicemembers Civil Relief Act.

THE UNDERSIGNED AFFIRMS THAT THE FACTS SET FORTH HEREIN ARE TRUE AND CORRECT TO THE BEST OF THEIR KNOWLEDGE, INFORMATION AND BELIEF.

By: Kirk Cunningham, Legal Assistant
JANEWAY LAW FIRM, P.C.
bankruptcy@janewaylaw.com
File: 25-034634/Lee

Subscribed and affirmed before me in Douglas County, State of Colorado on June 5, 2025
        Seal/ Commission expiration date

(Notary's official signature)

LESLI HAIDER
Notary Public
State of Colorado
Notary ID # 20074011116
My Commission Expires 03-16-2027

Department of Defense Manpower Data Center

Results as of : Jun-05-2025 01:54:17 PM EDT

SCRA 5.24



**Status Report**
**Pursuant to Servicemembers Civil Relief Act**

SSN:            XXX-XX-0459

Birth Date:

Last Name:      LEE

First Name:     MICHELLE

Middle Name:    DEON

Status As Of:   Jun-05-2025

Certificate ID: RF39SVMK3CC2YRG

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, Space Force, NOAA, Public Health, and Coast Guard).  This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

*Sam Yousefzadeh*

Sam Yousefzadeh, Director
Department of Defense - Manpower Data Center
4800 Mark Center Drive, Suite 04E25
Alexandria, VA 22350

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | Case No: | 24-16918 - KHT |
| MICHELLE DEON LEE, | | |
| Debtor | | |
| BELLCO CREDIT UNION and its SUCCESSORS, | Chapter | 7 |
| ASSIGNS, SERVICERS, TRUSTEES AND INVESTORS, | | |
| Creditor | | |
| vs. | | |
| MICHELLE DEON LEE and TOM H. CONNOLLY, | | |
| Trustee | | |
| Respondents | | |

**NOTICE OF Amended MOTION FOR RELIEF FROM STAY
AND OPPORTUNITY FOR HEARING PURSUANT TO 11 U.S.C. § 362(d)
OBJECTION DEADLINE: June 24, 2025**

YOU ARE HEREBY NOTIFIED that a Motion for Relief from Stay has been filed, a copy of which is attached hereto.

A hearing on the Motion has been set for **July 1, 2025 at 9:30 A.M. at the U.S. Custom House, 721 19th Street, in COURTROOM D, Denver, Colorado 80202-2508**. The hearing will be conducted in accordance with the provisions of Local Bankruptcy Rule 4001-1. The hearings will be held telephonically. Call 833-568-8864 – meeting ID 160 632 4304

IF YOU DESIRE TO OPPOSE THIS MOTION, you must file with this court a WRITTEN OBJECTION to the motion on or before the objection deadline stated above and serve a copy upon Movant's attorney, whose address is listed below.

If you file an objection, you are REQUIRED to comply with L.B.R. 4001-1 regarding hearing procedures, including (1) the timely submission and exchange of witness lists and exhibits and (2) attendance at the above-scheduled hearing in person or through counsel, if represented.

**IF YOU FAIL TO FILE AN OBJECTION**, the scheduled hearing will be **vacated**, and an order granting the relief requested may be granted without further notice to you.

Dated: June 5, 2025
JANEWAY LAW FIRM, P.C.
Attorneys for BELLCO CREDIT UNION

_____
Lynn M. Janeway #15592
David R. Doughty #40042
Alison L. Berry #34531
N. April Winecki #34861
9540 Maroon Circle, Suite 320
Englewood, CO 80112
Phone: (303) 706-9990 Fax: (303) 706-9994
bankruptcy@janewaylaw.com
File: 25-034634/Lee

ActiveUS 91372659v.11

## Certificate of Service

The undersigned hereby certifies that on June 6, 2025 a copy of the Amended Motion for Relief from Stay and Notice to Amended Motion for Relief from Stay was served:

**VIA US FIRST CLASS MAIL POSTAGE PREPAID TO:**

Michelle Deon Lee
16480 Fairway Dr
Commerce City, CO 80022

B&B Investments
5311 Niagara St
Commerce City, CO 80022

Kalamata Capital Group
1 Blue Hill Plaza
#1509
Pearl River NY 10965

Mulligan Funding LLC
4715 Viewridge av
Suite 100
San Diego, CA 92123

Rushmore Servicing
PO Box 619098
Dallas, TX 75261

US Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101

**ELECTRONICALLY VIA CM/ECF TO:**

JOHN SCANLAN - Attorney for Debtor(s)

TOM H. CONNOLLY, TOM CONNOLLY, LLC - Trustee

US TRUSTEE

*/s/Amanda Schroeder*
By: Amanda Schroeder, Paralegal
JANEWAY LAW FIRM, P.C.
bankruptcy@janewaylaw.com
File: 25-034634/Lee

Loan No:
Borrower:  MICHELLE D. LEE

Data ID:

# HOME EQUITY LINE OF CREDIT AGREEMENT
## AND DISCLOSURE STATEMENT

April 14, 2022
[Date]

COMMERCE CITY
[Title City]

COLORADO
[Title State]

16480 FAIRWAY DRIVE
COMMERCE CITY, CO 80022
[Property Address]

| | | | |
|---|---|---|---|
| Credit Limit | $ 300,000.00 | Loan Term | 20 years |
| Fixed Rate Min. Advance | $ 5,000.00 | Repayment Period | up to 20 years |
| Margin | 2.000% | Due Date | 28th of each month |
| Floor Rate | 3.750% | Draw Period | 10 years |
| Maximum Rate | 21.00% | Draw Period Payment Options (see Section 6): | |
| Initial Advance | $ 300,000.00 | ☐ Option 1: 1% of Account Balance | |
| Initial ANNUAL PERCENTAGE RATE  5.500% | | ☒ Option 2: Interest Only | |

**Initial Rate Not Discounted.** The Daily Periodic Rate is 0.0151%, **which corresponds to the Initial ANNUAL PERCENTAGE RATE (or "APR") indicated above.** The APR may change and will be determined by adding the Margin described above to the Index (as defined in Section 1 below). This Initial APR applies to the Variable Rate Subaccount only.

1.  **DEFINITIONS:**
    (A) **"Agreement"** means this document.
    (B) **"You"** or **"Your"** is MICHELLE D. LEE. Your address is 16480 FAIRWAY DRIVE, COMMERCE CITY, CO 80022
    (C) **"Lender"** is BELLCO CREDIT UNION. Lender's address is 7600 E. ORCHARD ROAD, SUITE 400N, GREENWOOD, CO 80111.
    (D) **"Holder"** is Lender or any person or entity who takes this Agreement by transfer and is entitled to receive payments under this Agreement.
    (E) **"Account"** means your home equity line of credit account with Holder.
    (F) **"Loan"** or **"Loans"** means any money advanced to you by Holder.
    (G) **"Credit Limit"** means the maximum aggregate amount of principal of the Loans that Holder will allow you to owe under this Agreement, unless otherwise agreed.  **The Credit Limit is indicated on page 1.**
    (H) **"Account Balance"** means the total of the unpaid principal of the Loans, plus earned but unpaid FINANCE CHARGES, fees, and credit insurance premiums for all Subaccounts.
    (I) **"Subaccount"** means an account created under the main Account used to differentiate between the various balances, interest rates, payments and repayment periods you may have under this Agreement. You may only have one Variable Rate Subaccount, but you may have up to three (3) Fixed Rate Subaccounts at any one time.
    (J) **"Maximum APR"** means the lesser of the Maximum Rate (as reflected on Page 1 of this Agreement) or the highest allowable rate for this type of Agreement as determined by applicable state or federal law.
    (K) **"Draw Period"** means the period of time during which you may request Loans.  **The Draw Period is indicated on page 1.**
    (L) **"Repayment Period"** means the period of time you have to repay a Subaccount Account Balance. For the Variable Rate Subaccount, the Repayment Period begins at the end of the Draw Period during which you no longer may request Loans and must repay the Account Balance for a Variable Rate Subaccount. For a Fixed Rate Subaccount you must begin repaying the Account Balance immediately after taking the Loan, and you may choose a Repayment Period of up to 20 years, but not exceeding the remaining Loan Term.
    (M) **"Periodic Statement"** means a statement furnished by Holder each Billing Cycle (as defined in subsection (N) below) that shows, among other things, Loans, FINANCE CHARGES, other charges, payments made, other credits, the previous Account Balance, the current Account Balance during the Billing Cycle.

*(Page 1 of 8 Pages)*

INITIALS:

Loan No:▮▮▮▮▮                                                      Data ID:▮▮

(N) "**Billing Cycle**" means the regular period or interval between the days or dates of the Periodic Statements during which **FINANCE CHARGES** accrue and that will be used to determine the amount of your payment. The Billing Cycle is **monthly**.

(O) "**Index**" means the U.S. Prime Rate as published by "The Wall Street Journal". If "The Wall Street Journal" ceases to publish the U.S. Prime Rate, the Holder will choose another method of identifying the U.S. Prime Rate, and notify you before the next change in the interest rate.

(P) "**Fixed Rate Subaccount**" means an account on which your APR will be fixed at the rate in effect at the time you take the advance for Holder's standard fixed-rate subaccounts based on your creditworthiness, combined loan-to-value ratio, and lien position at the time you applied for the Account. **The Fixed Rate Minimum Advance is indicated on page 1.** You cannot have more than three (3) Fixed Rate Subaccounts at any one time.

(Q) "**Variable Rate Subaccount**" means that your primary line of credit account for which a variable APR will apply during the Draw Period. The variable APR is determined by adding the Margin (which is based upon your creditworthiness, and combined loan-to-value ratio at the time you applied for the Account) to the Index. This variable APR will apply to new Loans made under this Variable Rate Subaccount only during the Draw Period. There is only one (1) Variable Rate Subaccount. During the Repayment Period for the Variable Rate Subaccount, the rate will be fixed at the rate in effect at the time the Repayment Period begins for Holder's standard fixed-rate subaccounts based on your creditworthiness, combined loan-to-value ratio, and lien position at the time you applied for the Account.

(R) "**Fixed Rate Minimum Advance**" means the minimum amount of a Loan that you must request on the Fixed Rate Subaccount. **The Fixed Rate Minimum Advance is indicated on page 1.**

(S) "**VR Minimum Monthly Repayment Period Amount**" is an amount sufficient to repay the Account Balance on your Variable Rate Subaccount at the end of the Draw Period, plus any FINANCE CHARGES, fees, expenses, and credit insurance premiums that continue to accrue during the Repayment Period, in equal monthly installments over a payoff period of 120 months calculated at a fixed rate of interest.

(T) "**FR Minimum Monthly Payment Amount**" is an amount sufficient to repay the Fixed Rate Subaccount Loan, plus any FINANCE CHARGES, fees, expenses, and credit insurance premiums that accrue during the Repayment Period for such Fixed Rate Subaccount, in substantially equal payments over the remaining term of the applicable Fixed Rate Subaccount Repayment Period at a fixed rate of interest.

(U) "**Due Date**" means the date of which your payment is due each month for all Subaccounts.

**2. OPENING YOUR ACCOUNT**

The Account will be opened when you have signed and delivered in acceptable form all documents considered necessary by Holder, you have met all of Holder's conditions for opening the Account and after any right you have to cancel this Agreement expires. Each of you who signs this Agreement is jointly and individually obligated to keep all of the promises made in this Agreement, and, as such, Holder may require any of you to pay all amounts due under this Agreement. Each of you agrees not to give Holder conflicting instructions under this Agreement.

**3. ACCESSING YOUR ACCOUNT**

You may access the Account after the Account is opened, except that you may access the Account initially only for an amount equal to the Initial Advance prior to the Account being opened. Thereafter, you may access the Account only for an amount equal to or greater than the Minimum Advance for each subaccount type. Holder at Holder's option may without obligation make a Loan in an amount that is less than the Minimum Advance; by doing so, however, Holder does not waive the right to later refuse to make such a Loan.

You may access the Account by: (a) writing a check using one of the checks that Holder furnishes to you ("Checks"); or (b) any other method acceptable to Holder. Each of you who signs this Agreement may access the Account jointly or individually, and Holder may rely on instructions from any one of you with regard to this Agreement.

You may not use any Loan provided by Holder to make payments on the Account. In addition, Holder reserves the right not to honor a Check under the following circumstances: (a) the Check is post-dated (if a post-dated Check is paid and as a result any other Check is returned, Holder will not be responsible); (b) a Check or Checks have been reported lost or stolen; (c) the Check is not signed by one of you; or (d) the Account has been terminated or suspended as provided in this Agreement or may be so terminated or suspended if Holder pays the Check. Dishonor of a Check by Holder for any reason provided in this Agreement will not constitute wrongful dishonor. Holder's liability otherwise for wrongful dishonor, if any, of a Check is limited to your actual damages.

*(Page 2 of 8 Pages)*

INITIALS: _____ _____

Loan No▮▮▮▮▮▮▮▮                                              Data ID: ▮▮▮

**4.   AVAILABILITY OF LOANS**

You may access the Account and receive a Loan during the Draw Period, subject to the provisions of this Agreement and applicable law. Holder at Holder's option may extend the Draw Period. During the Draw Period, you may borrow against the Account, repay any portion of the Account Balance, and re-borrow such portions up to the Credit Limit.

You may not access the Account so as to cause the Account Balance to exceed the Credit Limit. However, Holder at Holder's option may make a Loan that causes the Account Balance to exceed the Credit Limit; by doing so, however, Holder does not waive the right to later refuse to make such a Loan. If Holder agrees to make a Loan that causes the Account Balance to exceed the Credit Limit, such a Loan may be unsecured and you agree to repay the amount in excess of the Credit Limit on Holder's demand or execute additional security documents.

**5.   FINANCE CHARGES**

In addition to the amount of any Loans made to you, you agree to pay Holder a FINANCE CHARGE ("FINANCE CHARGE" or "FINANCE CHARGES") on the FC Account Balance for each Subaccount opened. The "FC Account Balance" for each Subaccount is determined each day by taking the preceding day's ending Account Balance for that Subaccount and (a) subtracting any unpaid FINANCE CHARGE, expenses, fees, and credit insurance premiums that are due for that Subaccount; (b) subtracting the portion of any payments or credits received by Holder that day that apply to the repayment of the Subaccount; and (c) adding any Loans made that day for that Subaccount.

The FINANCE CHARGE on a Loan begins to accrue immediately from the time Holder makes the Loan to you. There is no "free ride period" or "grace period" during which FINANCE CHARGES will not accrue.

The FINANCE CHARGE is determined for each Subaccount each day by applying the applicable daily periodic rate ("Daily Periodic Rate") to the FC Account Balance on that day for the Subaccount. The Daily Periodic Rate is 1/365th (or 1/366th as applicable) of the APR applicable to that Subaccount on that day. The total FINANCE CHARGE for each Subaccount during a Billing Cycle is determined by adding together the FINANCE CHARGE for the actual number of days during the Billing Cycle.

**The Initial APR is indicated on the first page of this Agreement.** This Initial APR only applies to the Variable Rate Subaccount. Each Fixed Rate Subaccount will be assigned an APR at the time the Loan is made. The manner in which the APR will change, if at all, will be determined based on the type of subaccount involved.

For a Variable Rate Subaccount, the APR will increase or decrease if the Index increases or decreases. Any change in the APR will result in a corresponding change in the Daily Periodic Rate, as well as a corresponding change in the FINANCE CHARGE. The change in the FINANCE CHARGE may result in a corresponding increase or decrease in your monthly payment. Although the Index may change daily, the APR will only change on the first day of the Billing Cycle and will not increase more than once per Billing Cycle. The Index in effect on the day the APR is adjusted will be used to determine the new APR.

The APR will never exceed the Maximum APR, or be less than the Floor Rate (as shown on Page 1 of this Agreement). The APR includes only interest and no other costs.

**6.   PAYMENTS**

You promise to pay to Holder any amounts owed under this Agreement for any and all of the Subaccounts opened under this Agreement. The payments will be calculated as follows:

**(A)   Variable Rate Subaccount Payment during the Draw Period**

During the Draw Period for the Variable Rate Subaccount, no later than your payment Due Date, you must pay at least the Minimum Monthly Draw Period Payment. The "Minimum Monthly Draw Period Payment" is the greater of: (1) your payment under Payment Option 1 or Payment Option 2; or (2) fifty dollars ($50.00). Provided the amount of Payment Option 1 is greater than Payment Option 2, you can choose a Payment Option when the Account is opened and at any later date by submitting your request in writing. Once the payment for Payment Option 2 is greater than Payment Option 1, your payment will automatically be changed to Payment Option 2 without any further action from you. Payment Option 1 is one percent (1.00%) of your Variable Rate Subaccount Balance on the last day of the Billing Cycle. Payment Option 2 is the amount of FINANCE CHARGES that accrued on your Variable Rate Subaccount during the preceding Billing Cycle. The Minimum Monthly Draw Period Payment will also include: (a) any amounts past due on your Account; (b) late charges and any other charges authorized by this Agreement, including, without limitation, any expenses or advances incurred by Lender under the Security Instrument; (c) premiums for any optional credit life insurance you may decide to obtain through Lender; and (d) the amount of the Account Balance that exceeds the Credit Limit.

**(B)   Variable Rate Subaccount Payment during the Repayment Period**

During the Repayment Period for the Variable Rate Subaccount, no later than your payment Due Date, you must begin repaying the Account Balance of the Variable Rate Subaccount at the end of the Draw Period by paying the VR Minimum Monthly Repayment Period Amount. The rate used during your Variable Rate Subaccount Repayment Period will be fixed at the rate in effect at the time the Repayment Period begins for Holder's standard fixed-rate subaccounts based on your creditworthiness, combined loan-to-value ratio, and lien position at the time you applied for the Account.

*(Page 3 of 8 Pages)*

INITIALS: ▮▮▮▮  _____

Loan No: ████████          Data ID: ██

**(C)  Fixed Rate Subaccount Payment during the Repayment Period**
For Fixed Rate Subaccounts, you must begin repaying the Loan immediately after the Loan is advanced. No later than your payment Due Date, you must begin repaying the Account Balance by paying the FR Minimum Monthly Payment Amount.  The rate used during your Fixed Rate Subaccount Repayment Period will be fixed at the rate in effect at the time you take your advance for Holder's standard fixed rate subaccounts based on your creditworthiness, combined loan-to-value ratio, and lien position at the time you applied for the Account.  As you pay the principal balance down on any Fixed Rate Subaccount during the Draw Period, the available balance in the Variable Rate Subaccount will increase accordingly.  Upon commencement of any Fixed Rate Subaccount, you will receive a Fixed Rate Advance Receipt that sets forth the FR Minimum Monthly Payment Amount with a new respective account number.
**(D)  Final Payment**
On the last day of the Loan Term ("Maturity Date"), you must pay the entire Account Balance.
**(E)  General Payment Terms**
Regardless of the payment calculation described above, if the Account Balance of any Subaccount on the payment date is less than the required minimum payment for such Subaccount, you must pay the entire Account Balance for that Subaccount.  You must make all payments in U.S. dollars at the address shown on the Periodic Statement.  You agree to send one payment on or before the Due Date, and the single payment must be the cumulative amount owed for all Subaccounts opened.  Upon request, we can provide you with your cumulative minimum monthly payment.  This information may be made available online as well.
**(F)  Prepayment**
You may prepay all or any portion of the Account Balance at any time without penalty; however, if your prepayment does not fully repay the entire Account Balance, you must continue to make the required minimum monthly payments.  Prepayment of all of the Account Balance shall not terminate this Agreement nor cancel the Security Instrument described in Section 9 of this Agreement unless you specifically request that Holder do so in writing.  If you would like to prepay a specific Subaccount, your written request must be included with the prepayment, but must be a separate document.  Any notations on the prepayment method (e.g., a check) will not be honored.
**(G)  Partial Payments**
Holder may accept partial payments.  If the Holder accepts a partial payment, this does not relieve you from making the full payment on or before the Due Date.

**7.  FEES AND CHARGES**
You agree to pay the following additional fees and charges to the extent not prohibited by applicable law:
**(A)  Late Charge**
A late charge on any monthly payment not paid within 10 calendar days from the date the payment is due.  The amount of the charge will be $15.00 per each past-due Subaccount; provided, however, Holder may not charge this late charge to the extent prohibited by applicable law.
**(B)  Other FINANCE CHARGES**
The Other FINANCE CHARGES indicated on the first page of this Agreement.
**(C)  Other Loan Fees and Charges**
The Other Loan Fees and Charges are fees that are charged as incurred, primarily related to the use of checks to access the account.
**(D)  Payment of Holder's Costs and Expenses**
If you are in default, all costs and expenses, including without limitation reasonable attorneys' fees, Holder incurs in enforcing this Agreement.

**8.  NOTICES**
Unless applicable law requires a different method, any notice that must be given to you under this Agreement will be given by delivering it in person or mailing it by first class mail to the Property Address above or at a different address if you give Holder a written notice of your different address.  Any notice that must be given to Holder under this Agreement will be given by delivering it in person or mailing it by first class mail to Holder at the address stated in Section 1(C) above or at a different address if you are given a notice of that different address.

**9.  SECURITY**
The Account will be secured by a lien taken against your home pursuant to a separate Mortgage, Deed of Trust, or Security Deed ("Security Instrument") dated the same date as this Agreement.  The Security Instrument requires you to take certain actions to protect your home, which is located at the address shown above ("Property").  You could lose the Property and your home if you do not meet the conditions of this Agreement or the Security Instrument.  Some of the conditions of the Security Instrument are described as follows:
**"Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section 11, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract, or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of the Secured Debt.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

*(Page 4 of 8 Pages)*

INITIALS: _____   _____

Loan No: ■■■■■                                                                                           Data ID: ■

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 8 within which Borrower must pay the Secured Debt in full. If Borrower fails to pay the Secured Debt in full prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower."

For purposes of this Agreement and the Security Instrument, "Interest in Property" also includes any leasehold estate or similar right to occupy the Property.

You also agree to obtain and maintain such insurance(s) on the Property as Holder may require; you agree to maintain such insurance in the amounts and for the periods Holder requires. Unless prohibited by applicable law, the Account will be secured as well by proceeds of such insurance. You may obtain such insurance from the carrier of your choice, subject to Holder's right to disapprove your choice, which right will not be exercised unreasonably.

If you fail to keep the insurance required under this Section, Holder may obtain such insurance coverage at Holder's option and your expense. Holder is under no obligation to purchase any particular type or amount of coverage, except if your Property is located in a flood zone; as such, you, your equity in the Property, or the contents of the Property may not be protected to the extent you desire. Any amount paid by Holder under this Section will be added as a Loan under this Agreement and be subject to the **FINANCE CHARGE.**

**10. CREDIT AND PROPERTY INFORMATION**
You agree to furnish personal financial information and information about the Property and your occupancy of the Property reasonably requested by Holder from time to time. Such information must be furnished to Holder within a reasonable time but in no event later than 30 days after Holder's request. In addition, you authorize Holder, at Holder's expense, to make credit inquiries, and you authorize any person to whom Holder makes such inquiries to furnish Holder with the requested information. You also authorize Holder to release information regarding the status and history of the Account to third persons, including without limitation credit bureaus, merchants, and financial institutions, to the extent permitted by applicable law.

**11. ASSIGNMENT**
Holder may assign or transfer this Agreement and the Security Instrument without notice to you. You may not assign or transfer your rights and obligations under this Agreement without Holder's written authorization; however, this Agreement is binding upon your heirs, successors, and legal representatives.

**12. TAX DEDUCTIBILITY**
You should consult a tax advisor regarding the deductibility of interest and charges under the Account.

**13. DEFAULT**
You will be in default under this Agreement if:
(A) You engage in fraud or material misrepresentation in connection with the Account or with any aspect of the Account, including without limitation your application for the Account and your occupancy of the Property;
(B) You do not meet the repayment terms under this Agreement;
(C) Your action or inaction adversely affects the collateral for the Account (including without limitation the Property) or Holder's rights in the collateral under the Security Instrument, including without limitation: (i) your failure to maintain insurance as required under the Security Instrument; (ii) your transfer of the Property as provided in the Security Instrument; (iii) your failure to maintain the Property or use of the Property in a destructive manner; (iv) your commission of waste of the Property; (v) your failure to pay taxes due on the Property or your failure to act such that a lien superior to Holder's lien is filed against the Property; (vi) the death of all of you; (vii) the Property is taken by condemnation or eminent domain; (viii) a judgment is filed against you that subjects the Property to action that adversely affects Holder's interest in the Property; (ix) the creation of a lien on the Property without Holder's permission; or (x) a superior lien holder forecloses on the Property such that Holder's interest in the Property is adversely affected.

*(Page 5 of 8 Pages)*

INITIALS: _____

Loan No [REDACTED]                                                                          Data ID: [REDACTED]

**14. REMEDIES FOR DEFAULT**

If you are in default, Holder may terminate the Account, require you to pay the entire outstanding Account Balance, and charge a termination fee and any collection fees unless otherwise prohibited from doing so by applicable law. Holder at Holder's option also may take one or more lesser actions. Such lesser actions may include without limitation reducing the Credit Limit. Holder may take action under this Section only after complying with any notice or cure provisions required under applicable law. In the event Holder elects not to terminate the Account or take lesser action when you are in default, Holder does not forfeit or waive Holder's right to do so at a later time or to do so if you are in default again.

**15. SUSPENSION OF ACCOUNT AND REDUCTION OF CREDIT LIMIT**

Unless otherwise prohibited from doing so by applicable law, Holder may temporarily suspend the Account or reduce the Credit Limit if:

(A) The value of the Property declines significantly below the Property's appraised value for purposes of the Account;

(B) Holder reasonably believes you will not be able to meet the repayment requirements under this Agreement due to a material change in your financial circumstances;

(C) You are in default of a material obligation of this Agreement or the Security Instrument; for purposes of this Agreement a material obligation will include without limitation your obligation to supply Holder with the credit and property information required under Section 10 of this Agreement;

(D) A governmental action prevents Holder from imposing the APR or impairs Holder's security interest under the Security Instrument such that the value of the security interest is less than 120 percent of the Credit Limit;

(E) A regulatory agency has notified Holder that continued advances would constitute an unsafe practice;

(F) The APR reaches the Maximum APR permitted under this Agreement; or

(G) Any of you requests to do so; provided, that Holder may require that any such request be in writing and sent to Holder by mail, and that Holder may require that any request to reinstate the Account also be in writing and sent by all of you.

If Holder suspends the Account or reduces the Credit Limit, Holder will send you notice of Holder's decision as provided in Section 8 of this Agreement. Any request by you to reinstate the Account or the Credit Limit must be in writing and sent to Holder as provided in Section 8 of this Agreement.

**16. CHANGING THE TERMS OF THIS AGREEMENT**

Holder may not change the terms of this Agreement except under the following circumstances:

(A) Holder may change the Index and Margin if the original Index or any replacement index is no longer available. Any new Index must have a historical movement similar to the original Index and together with a new Margin must result in an APR substantially similar to the APR in effect at the time the original Index or replacement index became unavailable.

(B) Holder may make changes that you agree to in writing.

(C) Holder may make changes that unequivocally benefit you throughout the remaining term of the Account.

(D) Holder may make changes to insignificant terms of this Agreement.

Unless otherwise prohibited from doing so by applicable law, Holder may refuse to make additional Loans or reduce the Credit Limit whenever the Maximum APR is reached.

**17. CANCELING THE ACCOUNT**

You may cancel the Account at any time by notifying Holder in writing as provided in Section 8. Cancellation of the Account by any of you will cancel the Account for all of you. However, Holder may release any of you from your obligations under this Agreement without releasing the remainder of you from your obligations.

If you cancel the Account, Holder may, at its option and as permitted by applicable law, assess a termination fee .

If the Account is canceled or terminated for any reason, you will not be entitled to a refund of or a credit for any initial, annual or other fees and charges payable under the Account, unless otherwise required by applicable law. In addition, you must return to Holder the Checks and any other devices you may have to access the Account. Any further use of such devices may be considered fraudulent. Regardless of such cancellation or termination, you will remain obligated to repay the Account Balance in full, including any money advanced to you after the Account has been canceled or terminated.



INITIALS:

Loan No: ████                                                                                    Data ID: ████

**18. LOAN CHARGES**

If this Agreement is subject to a law that sets maximum Loan charges, and that law is finally interpreted so that the FINANCE CHARGE or other Loan charges collected or to be collected in connection with the Account exceed the permitted limits, then: (a) any such charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from you that exceeded permitted limits will be refunded to you. Holder may choose to make this refund by reducing the principal owed under the Account or by making a direct payment to you. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge. Your acceptance of any such refund made by direct payment to you will constitute a waiver of any right of action you might have arising out of such overcharge.

**19. SEVERABILITY**

In the event that any provision or clause of this Agreement or the Security Instrument conflicts with applicable federal, state, or local law, such provision or clause will be considered changed to the extent permissible and necessary to comply with such law. Otherwise, such conflict will not affect other provisions of this Agreement or the Security Instrument that can be given effect without the conflicting provision.

**20. YOUR BILLING RIGHTS-KEEP THIS NOTICE FOR FUTURE USE**

This notice contains important information about your rights and Holder's responsibilities under the Fair Credit Billing Act.

**Notify Holder In Case of Errors or Questions About Your Bill**

If you think the Periodic Statement is wrong, or if you need more information about a transaction on the Periodic Statement, write Holder at the address listed on the Periodic Statement. Write to Holder as soon as possible. Holder must hear from you no later than 60 days after Holder sent you the first Periodic Statement on which the error or problem appeared. You can telephone Holder, but doing so will not preserve your rights. In your letter, give Holder the following information:

(A) Your name and account number.
(B) The dollar amount of the suspected error.
(C) Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized Holder to pay the Account automatically from your savings, checking, or other account, you can stop the payment on any amount you think is wrong. To stop the payment your letter must reach Holder three business days before the automatic payment is scheduled to occur.

**Your Rights and Holder's Responsibilities After Holder Receives Your Written Notice**

Holder must acknowledge your letter within 30 days, unless Holder has corrected the error by then. Within 90 days, Holder must either correct the error or explain why Holder believes the Periodic Statement was correct.

After Holder receives your letter, Holder cannot try to collect any amount you question or report you as delinquent. Holder can continue to bill you for the amount you question, including FINANCE CHARGES, and Holder can apply any unpaid amount against the Credit Limit. You do not have to pay any questioned amount while Holder is investigating, but you are still obligated to pay the parts of the Periodic Statement that are not in question.

If Holder finds that Holder made a mistake on the Periodic Statement, you will not have to pay any FINANCE CHARGES related to any questioned amount. If Holder did not make a mistake, you may have to pay FINANCE CHARGES, and you will have to make up any missed payments on the questioned amount. In either case, Holder will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that Holder thinks you owe, Holder may report you as delinquent. However, if Holder's explanation does not satisfy you and you write to Holder within ten days telling Holder that you still refuse to pay, Holder must tell anyone Holder reports you to that you have a question about the Periodic Statement. And Holder must tell you the name of anyone Holder reported you to. Holder must tell anyone Holder reports you to that the matter has been settled between you and Holder when it finally is.

If Holder does not follow these rules, Holder can't collect the first $50.00 of the questioned amount, even if the Periodic Statement was correct.

**21. GOVERNING LAW**

This Agreement will be construed and enforced in accordance with the laws of the State of Colorado.

**22. YOUR RESPONSIBILITY**

You will promptly notify Holder of any changes in your name, address or employment. You further agree to provide Holder at Holder's request, updated information about your finances and matters affecting the title or value of the Property. You promise not to submit false or misleading information.

**23. DELAY IN ENFORCEMENT**

Holder may delay enforcing any right under this Agreement without losing that right or any other right.

*(Page 7 of 8 Pages)*

INITIALS: 

Loan No: ███████                                    Data ID: ████

By signing below, you agree to the terms of this Agreement. You also acknowledge and agree that you received a completed copy of this Agreement.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
MICHELLE D. LEE —Borrower

[Sign Original Only]

(Page 8 of 8 Pages)

Loan No: ▓▓▓▓▓▓    Data ID: ▓▓▓
Borrower:  MICHELLE D. LEE

After Recording Return To:
S3 SHARED SERVICE SOLUTIONS
ATTENTION:  HOME EQUITY PROCESSING CTR
971 CORPORATE BLVD
LINTHICUM, MD 21090

[Space Above This Line For Recording Data]

# DEED OF TRUST

## DEFINITIONS

**(A)  "Security Instrument"** means this document, which is dated April 14, 2022, together with all riders to this document.

**(B)  "Borrower"** is MICHELLE D. LEE.  Borrower is the trustor under this Security Instrument.

**(C)  "Lender"** is BELLCO CREDIT UNION.  Lender is, A STATE CHARTERED CREDIT UNION organized and existing under the laws of the State of COLORADO.  Lender's address is 7600 E. ORCHARD ROAD, SUITE 400N, GREENWOOD, CO 80111.  Lender is the beneficiary under this Security Instrument.

**(D)  "Trustee"** is THE PUBLIC TRUSTEE of ADAMS County, Colorado.

**(E)  "Secured Indebtedness"** means:

    (1)  The debt, interest, finance charges, and other fees and charges incurred under the terms of the Home Equity Line of Credit Agreement and Disclosure Statement ("HELOC") dated April 14, 2022; the HELOC matures on April 14, 2042.

    (2)  Any advance made to Borrower or obligation incurred by Borrower pursuant to any contract or evidence of indebtedness benefiting Lender, regardless of whether such advance has been made or such obligation has been incurred in whole or in part as of the date of this Security Instrument.

    (3)  Any sum paid and expense incurred by Lender under the terms of this Security Instrument.

**(F)  "Credit Limit"** means the maximum aggregate amount of principal that may be secured by this Security Instrument at any one time.  The Credit Limit is $300,000.00.  Except to the extent prohibited by Applicable Law, the Credit Limit does not apply to interest, finance charges, and other fees and charges validly incurred by Borrower under this Security Instrument.  The Credit Limit also does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

**(G)  "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H)  "Riders"** means all riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower [check box as applicable]:

☐  Condominium Rider    ☒  Planned Unit Development Rider
☐  1-4 Family Rider    ☐  Other(s) [specify]

**(I)  "Applicable Law"** means all controlling applicable federal, state, and local statutes, regulations, ordinances, and administrative rules and orders (that have the effect of law) as well as applicable final, non-appealable judicial opinions.

Loan No: ███████                                      Data ID: ████

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Secured Indebtedness, and all renewals, extensions, and modifications of the Secured Indebtedness; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the HELOC.  For this purpose, Borrower, in consideration of the debt and the trust herein created, irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY of ADAMS:

LOT 21, REUNION FILING NO. 6, 2ND AMENDMENT, COUNTY OF ADAMS, STATE OF COLORADO.

which currently has the address of 16480 FAIRWAY DRIVE,
                                                        [Street]
COMMERCE CITY, COLORADO                    80022          ("Property Address"):
[City]                                                  [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property.  All replacements and additions also shall be covered by this Security Instrument.  All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record.  Borrower warrants and shall defend generally the title to the Property against all claims and demands, subject to any encumbrances of record and liens for taxes for the current year not yet due and payable.

ADVANCES

Any advances made under the HELOC may be made, repaid, and remade from time to time, subject to the limitations of the HELOC.  Regardless of whether the Secured Indebtedness is reduced to a zero balance, this Security Instrument shall remain in effect until released or reconveyed.

Any advances made in excess of the Credit Limit shall not be secured by this Security Instrument if prohibited by Applicable Law or, if not prohibited by Applicable Law, unless (i) Lender agrees to increase the Credit Limit and complies with any subsequent disclosure, rescission, and other requirements under Applicable Law and (ii) Borrower agrees to execute any documents Lender requires to evidence and secure the increase in the Credit Limit.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Loan No: ▮▮▮▮▮                                                  Data ID: ▮▮▮

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

   **1. Payment of Secured Indebtedness; Performance of Obligations.** Borrower shall pay when due the Secured Indebtedness and shall perform all of Borrower's obligations under the HELOC and this Security Instrument.

   **2. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property that can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and the dues, fees, and assessments of a condominium association, homeowners association, or similar organization, if any.

   Borrower shall make all payments and comply with all covenants as and when required by any mortgage, deed of trust, security agreement, or other lien document evidencing a lien that is prior to this Security Instrument and that is approved by Lender. Borrower shall not modify, extend, or increase the amount secured by such prior lien document without Lender's written consent.

   Upon demand Borrower shall furnish to Lender satisfactory evidence of payment of such taxes, assessments, charges, fines, impositions, and prior liens.

   Borrower shall promptly discharge any lien not approved by Lender that has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings that in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien that can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 2.

   **3. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against fire, hazards included within the term "extended coverage," flood, and any other hazards including without limitation earthquakes, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences may change during the term of the HELOC. Borrower may obtain such insurance from the insurance carrier of Borrower's choice, subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably.

   If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard, or liability, and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 3 shall be Secured Indebtedness and shall be payable according to the terms of the HELOC.

   All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

   In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the Secured Indebtedness, whether or not then due, with the excess, if any, paid to Borrower.

**COLORADO HELOC Deed of Trust**                         1/04      *(Page 3 of 8 Pages)*

Loan No: ▮▮▮▮▮▮                                                                    Data ID: ▮▮

**4. Preservation, Maintenance, and Protection of the Property; Occupancy and Use of the Property; and Inspection.** Borrower shall not destroy, damage, or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value, due to its condition, such as would adversely affect Lender's security in the Property. Unless it is determined pursuant to Section 3 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower shall not be relieved of Borrower's obligation for the completion of such repair or restoration.

Borrower shall not materially change the present occupancy and use of the Property without Lender's written consent. Borrower shall not use the Property in an illegal manner or for any illegal use such as would subject the Property to seizure.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**5. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien that may attain priority over this Security Instrument, or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions may include, but are not limited to: (a) paying any sums secured by a lien that has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees, to the extent not prohibited by Applicable Law, to protect its interest in the Property and/or rights under this Security Instrument, including Lender's secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 5, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 5.

Any amounts disbursed by Lender under this Section 5 shall be Secured Indebtedness and shall be payable according to the terms of the HELOC.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing. If the Property is located in a condominium project or a planned unit development, Borrower shall perform all of Borrower's obligations under the covenants, by-laws, or regulations of the condominium project or planned unit development.

**6. Condemnation.** Borrower shall give Lender prompt notice of any condemnation or eminent domain proceeding or action pending or threatened against the Property and authorizes Lender to intervene in Borrower's name in any such proceeding or action. Borrower assigns to Lender any money awarded to Borrower pursuant to such proceeding or action, and such money shall be applied to the Secured Indebtedness, whether or not then due, with the excess, if any, paid to Borrower.

**7. Loan Charges.** If the HELOC is subject to a law that sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the HELOC exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower that exceeded permitted limits shall be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the HELOC or by making a direct payment to Borrower. If a refund reduces principal, the reduction shall be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the HELOC). Borrower's acceptance of any such refund made by direct payment to Borrower shall constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**COLORADO HELOC Deed of Trust**                          1/04    *(Page 4 of 8 Pages)*

Loan No: ███████     Data ID: ███

**8. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement shall satisfy the corresponding requirement under this Security Instrument.

**9. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. In the event that any provision or clause of this Security Instrument or the HELOC conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the HELOC that can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**10. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the HELOC (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant, and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear, or make any accommodations with regard to the terms of this Security Instrument or the HELOC without the co-signer's consent.

Subject to the provisions of Section 11, any successor to the interests of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender.

**11. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 11, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract, or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of the Secured Indebtedness. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 8 within which Borrower must pay the Secured Indebtedness in full. If Borrower fails to pay the Secured Indebtedness in full prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**COLORADO HELOC Deed of Trust**          1/04   *(Page 5 of 8 Pages)*

Loan No: ███████     Data ID: ███

12.  **Hazardous Substances.**  As used in this Section 12: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety, or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property.  Borrower shall not do, or allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) that creates an Environmental Condition, or (c) that, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower promptly shall give Lender written notice of (a) any investigation, claim, demand, lawsuit, or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release, or threat of release of any Hazardous Substance; and (c) any condition caused by the presence, use, or release of a Hazardous Substance that adversely affects the value of the Property.  If Borrower learns, or is notified by any governmental or regulatory authority or any private party that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.  Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

13.  **Escrow for Taxes and Insurance.**  Unless otherwise provided in a separate agreement, Borrower shall not be required to pay in escrow to Lender funds for taxes, insurance, and other assessments.

14.  **Default.**  Borrower shall be in default under the HELOC and this Security Instrument if without limitation any of the following occur: (a) Borrower engaged or engages in fraud or material misrepresentation in connection with any aspect of the HELOC or this Security Instrument, including without limitation Borrower's application for the HELOC and Borrower's occupancy of the Property; (b) Borrower does not meet repayment terms under the HELOC; (c) Borrower's action or inaction adversely affects the collateral for the HELOC (including without limitation the Property) or Lender's rights in the collateral including without limitation: (i) Borrower's failure to maintain the insurance required under Section 3 of this Security Instrument; (ii) Borrower's transfer of the Property as provided in Section 11 of this Security Instrument; (iii) Borrower's failure to maintain the Property or use of the Property in a destructive manner; (iv) Borrower's commission of waste of the Property; (v) Borrower's failure to pay taxes due on the Property or Borrower's failure to act such that a lien superior to Lender's lien is filed against the Property; (vi) the death of all Borrowers; (vii) the Property is taken by condemnation or eminent domain; (viii) a judgment is filed against Borrower that subjects the Property to action that adversely affects Lender's interest in the Property; (ix) the creation of a lien on the Property without Lender's permission; or (x) a superior lien holder forecloses on the Property such that Lender's interest in the Property is adversely affected.

**NON-UNIFORM COVENANTS.**  Borrower and Lender further covenant and agree as follows:

15.  **Acceleration; Remedies.**  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 11 unless Applicable Law provides otherwise).  The notice shall comply with Applicable Law.  If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of the Secured Indebtedness without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 15, including without limitation reasonable attorneys' fees, to the extent not prohibited by Applicable Law, and costs of title evidence.

**COLORADO HELOC Deed of Trust**                1/04    *(Page 6 of 8 Pages)*

Loan No:    ▮▮▮▮                                    Data ID:  ▮▮

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold.  Lender shall mail a copy of the notice to Borrower as provided in Section 8.  Trustee shall record a copy of the notice in the county in which the Property is located.  Trustee shall publish a notice of sale for the time and in the manner provided by Applicable Law and shall mail copies of the notice of sale in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines.  Trustee may postpone sale of any parcel of the Property by public announcement at the time and place of any previously scheduled sale.  Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's certificate describing the Property and the time the purchaser will be entitled to Trustee's deed.  The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein.  Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including without limitation reasonable Trustee's and attorneys' fees to the extent not prohibited by Applicable Law; (b) to the Secured Indebtedness; and (c) any excess to the person or persons legally entitled to it.

If Borrower is in default, Lender may elect not to accelerate the Secured Indebtedness but instead may refuse to make additional advances or reduce the Credit Limit.  Even if Lender elects not to exercise any remedy under this Security Instrument, Lender does not forfeit or waive Lender's right to do so at a later time or to do so if Borrower is in default again.

**16.  Release.**  Upon payment in full of the Secured Indebtedness, Lender shall request that Trustee release this Security Instrument and shall produce for Trustee, duly cancelled, all agreements and notes evidencing debts secured by this Security Instrument.  Trustee shall release this Security Instrument without further inquiry or liability.  Borrower shall pay any recordation costs and the statutory Trustee's fees.

**17.  Waiver of Homestead.**  Borrower waives all right of homestead exemption in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.  Borrower also acknowledges receipt of a copy of this Security Instrument.

_____ (Seal)
MICHELLE D. LEE —Borrower

**COLORADO HELOC Deed of Trust**                    1/04     (Page 7 of 8 Pages)

Loan No: ███████                                      Data ID: ████

———————— [Space Below This Line For Acknowledgment] ————————

State of COLORADO                      §
County of *Arapahoe*                    §

This record was acknowledged before me on _April 14_____, 20 22 , by
MICHELLE D. LEE .

Stamp

_____
Signature of notarial officer

*Theresa Donaldson*
_____
(Printed Name)

*Notary Public*
_____
(Title of Office)

My commission expires: _1-15-25_

**THERESA DONALDSON**
**NOTARY PUBLIC**
**STATE OF COLORADO**
**NOTARY ID 20164048492**
**MY COMMISSION EXPIRES JANUARY 15, 2025**

**COLORADO HELOC Deed of Trust**                    1/04        *(Page 8 of 8 Pages)*

Loan No: ▆▆▆▆▆▆                                          Data ID: ▆▆▆▆
Borrower: MICHELLE D. LEE

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 14th day of April, 2022, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed ("Security Instrument") of the same date, given by the undersigned ("Borrower") to secure Borrower's Home Equity Line of Credit Agreement and Disclosure Statement ("HELOC") entered into with BELLCO CREDIT UNION ("Lender") of the same date and covering the Property described in the Security Instrument and located at:

16480 FAIRWAY DRIVE
COMMERCE CITY, CO 80022
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in

DECLARATIONS AND COVENANTS

("Declaration"). The Property is a part of a planned unit development known as

REUNION
[Name of Planned Unit Development]

("PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD ("Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.   PUD Obligations.**   Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument, or any equivalent document that creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues, and assessments imposed pursuant to the Constituent Documents.

**B.   Property Insurance.**   So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property that is satisfactory to Lender and that provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then Borrower's obligation under Section 3 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the HELOC.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower hereby are assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

MULTISTATE HELOC PUD RIDER                                 1/04        *(Page 1 of 3 Pages)*
© 2022 AsurityDocs

Loan No: █████████        Data ID: ████

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, hereby are assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 6.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action that would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional indebtedness of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the HELOC rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Loan No: ███████                                    Data ID: ████

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD
Rider.

....................................................................................(Seal)

MICHELLE D. LEE —Borrower

MULTISTATE HELOC PUD RIDER                    1/04        (Page 3 of 3 Pages)

Bank:    Belico Credit Union
Report:  LN_PDUE

Run Date:   05-28-2025
Post Date:  05-28-2025
Page:       1 of 2

Loan Bill Payment Due

Account Number :  ▅▅▅▅▅▅▅▅

** DO NOT MAIL **
MICHELLE D LEE
18590 E 19TH AVE SUITE 200
AURORA  CO  80011

Current Due Date :  05-28-2025
Amount Past Due  :   1,842.92

Major            : Consumer Loan
Minor            : Collateral In Liquidation
Rate of Interest :       10.500%
Principal Balance :     15,175.00

Principal Due     :       0.00
Interest Due      :   1,973.88
Escrow Due        :       0.00
Late Charge/Fee Due :    15.00
Other Charges Due :       0.00
Total Amount Due  :   1,988.88

--------Payment(s) Due

| Due Date | Balance Category | Amount |
|---|---|---|
| 04-28-2024 | Note Interest | 134.96 |
|  | Sub Total | 134.96 |
| 05-28-2024 | Note Interest | 130.60 |
|  | Sub Total | 130.60 |
| 06-28-2024 | Note Interest | 134.96 |
|  | Sub Total | 134.96 |
| 07-28-2024 | Note Interest | 130.61 |
|  | Sub Total | 130.61 |
| 08-28-2024 | Note Interest | 134.95 |
|  | Sub Total | 134.95 |
| 09-28-2024 | Note Interest | 134.96 |
|  | Sub Total | 134.96 |
| 10-28-2024 | Note Interest | 248.15 |
|  | Sub Total | 248.15 |
| 11-28-2024 | Note Interest | 134.96 |
|  | Sub Total | 134.96 |
| 12-28-2024 | Note Interest | 130.60 |
|  | Sub Total | 130.60 |
| 01-28-2025 | Note Interest | 135.28 |
|  | Sub Total | 135.28 |
| 02-28-2025 | Note Interest | 135.33 |
|  | Sub Total | 135.33 |
| 03-28-2025 | Note Interest | 122.23 |
|  | Sub Total | 122.23 |
| 04-28-2025 | Late Charge Balance | 15.00 |

**Bank:  Bellco Credit Union**
**Report:  LN_PDUE**

Run Date: **05-28-2025**
Post Date: **05-28-2025**
Page: **2 of 2**

**Loan Bill Payment Due**

**Account Number :** ▮

```
** DO NOT MAIL **
MICHELLE D LEE
18590 E 19TH AVE SUITE 200
AURORA CO 80011

Major         : Consumer Loan
Minor         : Collateral In Liquidation
Rate Of Interest  :     10.500%
Principal Balance :  15,175.00
```

```
Current Due Date :  05-28-2025
Amount Past Due  :   1,842.92

Principal Due    :       0.00
Interest Due     :   1,973.88
Escrow Due       :       0.00
Late Charge/Fee Due :    15.00
Other Charges Due :      0.00
Total Amount Due :   1,988.88
```

---------Payment(s) Due

| Due Date | Balance Category | Amount |
|---|---|---|
| | Note Interest | 135.33 |
| | Sub Total | 150.33 |
| 05-28-2025 | Note Interest | 130.96 |
| | Sub Total | 130.96 |
| | Total | 1,988.88 |

Bank:    Bellco Credit Union
Report:  LN_PDUE

Run Date:  05-21-2025
Post Date: 05-21-2025
Page:      1 of 1

**Loan Bill Payment Due**

** DO NOT MAIL **
MICHELLE D LEE
18590 E 19TH AVE SUITE 200
AURORA  CO  80011

Account Number :  ██████████

Major            : Consumer Loan
Minor            : Collateral In Liquidation
Rate of Interest :       4.990%
Principal Balance :   289,076.22

Current Due Date : 09-28-2024
Amount Past Due  : 14,915.73

Principal Due     :     0.00
Interest Due      :     0.00
Escrow Due        :     0.00
Late Charge/Fee Due :   0.00
Other Charges Due :     0.00
Total Amount Due  : 14,915.73

--------Payment(s) Due

| Due Date   | Balance Category     | Amount    |
|------------|----------------------|-----------|
| 02-28-2024 | Note Due             | 1,067.21  |
|            | Sub Total            | 1,067.21  |
| 03-28-2024 | Note Due             | 1,978.36  |
|            | Sub Total            | 1,978.36  |
| 04-28-2024 | Note Due             | 1,978.36  |
|            | Sub Total            | 1,978.36  |
| 05-28-2024 | Note Due             | 1,978.36  |
|            | Sub Total            | 1,978.36  |
| 06-28-2024 | Note Due             | 1,978.36  |
|            | Sub Total            | 1,978.36  |
| 07-28-2024 | Note Due             | 1,978.36  |
|            | Sub Total            | 1,978.36  |
| 08-28-2024 | Note Due             | 1,978.36  |
|            | Sub Total            | 1,978.36  |
| 09-28-2024 | Note Due             | 1,978.36  |
|            | Sub Total            | 1,978.36  |
|            | Total                | 14,915.73 |